UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID A. FIELD,                          *
                                         *
        Plaintiff,                       *
                                         *
        v.                               *        Civil Action No. 1:20-cv-11939 -IT
                                         *
SHEET METAL WORKERS'                     *
NATIONAL PENSION FUND,                   *
                                         *
        Defendant.

MEMORANDUM & ORDER

September 30, 2022

TALWANI, D.J.

        Plaintiff David Field, a participant in Defendant Sheet Metal Workers' National Pension

Fund ("NPF" or "Fund"), brings suit for plan benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).

Field alleges that the Fund wrongfully terminated his disability benefits by improperly

concluding that he had never been eligible for such a benefit in the first instance and that he had

engaged in disqualifying employment in 2016. Pending before the court are cross-motions for

summary judgment. For the following reasons, Field's Motion for Summary Judgment [Doc. No.

30] is DENIED and the Fund's Renewed Motion for Summary Judgment [Doc. No. 41] is

GRANTED.

## I.      Factual Background

### A.      The Fund and Relevant Plan Terms

        The Fund is a multiemployer pension plan within the meaning of 29 U.S.C.

§ 1002(37)(A). Pl.'s Resp. to Def.'s Statement of Material Facts ("PRSMF") ¶ 2 [Doc. No. 46].

The Board of Trustees of the NPF administers the Fund and is a plan "fiduciary" within the

meaning of 29 U.S.C. § 1002(21)(A). Id. at ¶ 3. Participants in the NPF Plan ("the Plan") are

eligible for benefits pursuant to the provisions of the NPF Plan Document ("Plan Document"). Def.s' Resp. to Pl.s' Statement of Material Facts ("DRSMF") ¶ 2 [Doc. No. 34].

Pursuant to § 2.02 of the Plan Document, an employer participates in the Plan as a Contributing Employer when it is a party to a collective bargaining agreement with SMWIA[1] and/or any Local[2] that, in pertinent part, requires contribution to the Fund for work performed in a job classification, and at a place of business, by a Covered Employee consistent with the collective bargaining agreement. Id. at ¶ 3. Covered Employee means a person who performs work covered by a collective bargaining agreement for a Contributing Employer. Plan Document at § 1.13 [Doc. No. 43-2]. Covered Employment, in relevant part, means work performed by an employee on behalf of one or more Contributing Employers in his or her capacity as a Covered Employee. Id. at § 1.14.

The Fund credits hours of service to Plan participants pursuant to the terms of the Plan Document. DRSMF ¶ 3 [Doc. No. 34]. To be eligible for full disability benefits pursuant to Article 16 of the Plan Document ("Disability Benefits"), participants, in relevant part, must have at least ten years of Pension Credit,[3] including at least five years of Future Service Credit,[4] and have been found disabled by the Social Security Administration ("SSA"). Id. at ¶ 5.

---

[1] The term "SMWIA" shall mean the Sheet Metal Workers' International Association, AFL-CIO, or the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART"), excepting the Transportation Division of SMART (or any affiliate of the Transportation Division of SMART). Plan Document at § 1.36 [Doc. No. 43-2].

[2] The term "Local" or "Local Union" shall mean a local union chartered by the SMWIA. Id. at § 1.22.

[3] Pension Credit is comprised of Covered Employment under the Plan both before and after an employer became a Contributing Employer. Id. at § 1.30.

[4] Future Service Credit means the periods of Covered Employment after which the employer becomes a Contributing Employer. Id. at § 1.20.

Section 8.02 of the Plan Document directs the Plan participant to provide accurate and complete information to the Fund Office when reasonably requested to do so and reserves the Fund's right to modify and or recover benefit payments if previously submitted information was not materially accurate or incomplete:

> Pensioner and Beneficiary shall furnish the Fund Office with any information or proof requested by it and reasonably required to administer the Plan. If a Participant or Pensioner or other claimant to benefits makes a materially inaccurate statement related to his claim for benefits, or furnishes materially inaccurate or incomplete information or proof relative to eligibility or continued eligibility for benefits, then benefits may be denied, suspended, or discontinued to the extent permitted by law. The Trustees shall have the right to recover any benefit payments made in reliance on any materially inaccurate or incomplete statement, information or proof submitted by a Participant, Pensioner or Beneficiary.

PRSMF ¶ 55 [Doc. No. 46].

Section 16.06(b) of the Plan Document states that a Disability Benefit will terminate if the recipient, ". . . performs any work of any kind whatsoever, regardless of compensation, for an employer engaged in the Sheet Metal Industry and that employer is not signatory to a collective bargaining agreement between the Union and the employers . . . or performs any work whatsoever in Disqualifying Employment . . . ." Id. at ¶ 25.

Section 1.35 of the Plan Document defines "Sheet Metal Industry" in pertinent part as follows:

> The term "Sheet Metal Industry" shall mean any and all types of work covered by collective bargaining agreements to which the Union and/or any Local are a party; or under the trade jurisdiction of the Union, as described in the SMWIA's constitution (except insofar as such trade jurisdiction relates solely to the Transportation Division); or in a related building trade; or any other work to which a sheet metal worker has been assigned, referred, or can perform because of his skills and training as a sheet metal worker.

Id. at ¶ 26.

Section 8.06(d)(1) of the Plan Document defines "Disqualifying Employment" as follows: "(i) employment with any Contributing Employer; (ii) employment with any employer

in the same or related business as any Contributing Employer; (iii) self-employment in the same or related business as a Contributing Employer; (iv) employment or self-employment in a business which is under the jurisdiction of the Union; or (v) employment in the Sheet Metal Industry that is not covered by a collective bargaining agreement between the Union and the employer." Id. at ¶ 27.

Section 8.03 of the Plan Document gives the Trustees "the sole and absolute power, authority and discretion to determine: . . . (2) the application and interpretation of the Plan Document; (3) entitlement to or amount of a pension; . . . (5) the crediting of Future or Past Service Credit and/or Contribution Hours; and (6) the crediting of Hours of Work and Years of Service." Id. at ¶ 4. The Trustees have delegated the aforementioned power, authority and discretion to the Appeals Committee of the Board of Trustees ("Appeals Committee"), which, pursuant to Section 8.03(b) of the Plan Document, has the same discretionary power and authority as the Trustees. Id. at ¶ 5. The decision of the Appeals Committee with respect to any matter within the range of such delegated authority is final and binding. Id. The Appeals Committee is comprised of one labor Trustee and one management Trustee. Id.

B.   *Field's Application for Disability Pension*

Field became a member of SMART Local Union 17 in Dorchester, Massachusetts, in 1981 and remains a retired member. DRSMF ¶ 1 [Doc. No. 34]. Field was a plan participant under the Plan. Id. at ¶ 2. On or about May 21, 1993, Field submitted an application for a disability pension to the Fund asserting that he was disabled and unable to work in the Sheet Metal Industry. PRSMF ¶ 6 [Doc. No. 46]. Specifically, Field represented that he was suffering from electrocution, herniated discs, and Crohn's disease. DRSMF ¶ 6 [Doc. No. 34]. In his application, Field stated that he had worked for the following Contributing Employers during the

4

period August 1981 to 1991: (i) Johnson Sheet Metal; (ii) Shane Engineering; and (iii) BFI Stephens. PRSMF ¶ 7 [Doc. No. 46].

In a July 29, 1993 letter, Fund staff informed Field that he was ineligible to receive disability pension benefits because he did not have 10 years of Pension Credit. Id. at ¶ 9.

In a September 8, 1993 letter, Field appealed the denial of a disability pension, requesting that the Fund credit him with hours which he had been credited with under the Local Plan before his Local's merger with the national Fund in 1989 and hours from Johnston Sheet Metal where he worked as an apprentice. DRSMF ¶ 10 [Doc. No. 34]; PRSMF ¶ 10 [Doc. No. 46]. In this letter, Field also stated that he was last gainfully employed in January 1991 "due to a serious electrocution suffered at the JFK building on January 17, 1991[,] which resulted in the last time [he] will ever be gainfully employed, due to [his] medical and physical condition." PRSMF ¶ 11 [Doc. No. 46]

Fund staff wrote to Field on November 17, 1993, informing him that he remained ineligible for disability pension benefits due to insufficient Pension Credit. Id. at ¶ 12.

On March 10, 1994, Bud Field, the owner of Field Fabrication Corporation ("Field Fabrication"), a union contractor, wrote to the Fund asserting for the first time that his son worked for Field Fabrication. DRSMF ¶ 13 [Doc. No. 34]. Bud Field claimed that, as the result of a clerical error, Field Fabrication had neglected to submit payment for hours Field had worked in 1987, 1990, and 1991. Id. Bud Field's letter indicated that Field Fabrication wanted to provide payment for those hours. PRSMF ¶ 14 [Doc. No. 46].

In a September 29, 1994 letter, the Fund notified Field that it accepted the foregoing payments[5] and credited the additional hours to Field for the corresponding contributions but that even with these additional credited contributions, he did not have the required 10 years of Pension Credit to qualify for a disability pension under the Plan Document. Id. at ¶ 15.

Subsequently, in a January 20, 1995 letter, Bud Field on behalf of Field Fabrication reported additional hours worked in 1982, 1990, and 1991 and paid contributions for Field for those hours with three bank cashier's checks. Id. at ¶ 16; DRSMF ¶ 16 [Doc. No. 34]. On January 31, 1995, Field reapplied for a disability pension. PRSMF ¶ 17 [Doc. No. 46]. Relying on the information and documents submitted by Field and Field Fabrication, the Fund approved Field's application for a disability pension effective February 1, 1995, and began paying him a monthly amount. Id. at ¶ 19.

Field received correspondence from the Fund from time to time thereafter, among other things reminding him that his disability pension may be terminated if he engaged in Disqualifying Employment at any time. Id. at ¶ 20.

C.    *Termination of Disability Benefit and Further Investigation*

In a July 11, 2019 letter, Fund staff informed Field that his Disability Benefit was terminated, as of August 1, 2008, because the Fund had obtained information demonstrating that Field had engaged in Disqualifying Employment under the Plan Document as early as August 1, 2008, and thus ceased to be eligible for disability benefits. Id. at ¶ 21. Fund staff noted that it had obtained information indicating that Field held an active Home Improvement Contractor license

---

[5] The Administrative Record did not contain copies of any checks tendering the contributions due on these hours, or any indication of the source of payments referenced in the letter. PRSMF ¶ 14 [Doc. No. 46].

in the Commonwealth of Massachusetts, and that he owned a company called David Field Construction, which was advertised publicly as a general contractor. Id. at ¶ 22. According to the Fund, Field was responsible for projects on the following dates: 8/13/2008, 5/14/2010, 2/19/2016, and 4/20/2016. Id. at ¶ 23 [Doc. No. 46]; DRSMF ¶ 32 [Doc. No. 34].

The Fund's July 11, 2019 letter informed Field that he had the right to appeal the decision to the Appeals Committee in writing within 180 days of receipt of the letter, and that "the Appeals Committee has full discretion to interpret the Plan, and its decision is final and binding." PRSMF ¶ 28 [Doc. No. 46]. The letter also informed Field that he had the right to request and receive copies of "all documents, records, and other information relevant to [his] claim for benefits." Id. at ¶ 29.

D.     *Appeals Process*

In a July 15, 2019 letter, Field notified the Fund of his intent to appeal and requested copies of all documents relating to his claim for benefits and the Fund's decision to terminate his benefits. Id. at ¶ 30. In that letter, Field stated that (i) he contacted the Massachusetts Building Department and verified that the permits for the August 2008 and May 2010 plumbing jobs were performed by a construction company owned by a different person with a similar name, and involved a license number not affiliated with him, and (ii) Juan Quishpilema had used his Commonwealth of Massachusetts Construction Supervisor and Home Improvement License numbers to issue the building permits for the February and April 2016 roofing jobs without his knowledge or permission, and that he received no income or benefits from those jobs. Id. at ¶ 31. Field explained that he had surgery on his hands for carpal tunnel syndrome in January 2016, and was in Florida recuperating when the February 2016 project was performed. DRSMF ¶ 35 [Doc. No. 34].

In the same letter, Field acknowledged that he continues to actively maintain (i) a Commonwealth of Massachusetts Master Sheet Metal License (ii) a Commonwealth of Massachusetts Construction Supervisor License (iii) a Commonwealth of Massachusetts Home Improvement License, and (iv) a commercial driver's license. PRSMF ¶ 32 [Doc. No. 46]. However, he claimed that he had never performed any work related to those licenses or earned any income from them. DRSMF ¶ 35 [Doc. No. 34].

In a September 16, 2019 letter, Fund staff provided Field with a copy of his pension file and responded to his appeal request. PRSMF ¶ 33 [Doc. No. 46]. Specifically, Fund staff (i) confirmed Field's active licenses in the Commonwealth of Massachusetts and the State of Florida, and (ii) requested that Field provide the following information:

- Details of the permits that have been issued to him under his licenses and describe the circumstances in which he would be present to obtain a license;

- Copies of his federal tax returns for the years 1990 to the present;

- Information as to what is required to obtain and maintain all of his licenses;

- An explanation of why, in correspondence dated after his 1993 appeal - in which he stated that he had not been "gainfully employed" since January 1991 - would Field Fabrication represent that he was employed for the period of January through July of 1991;

- Verification of his employment with Field Fabrication for that period, such as paystubs, tax records, social security records, and/or local union records verifying contributions on his behalf;

- An explanation of why his 1982 earnings as reported by the SSA do not reflect employment with Field Fabrication, and proof of his employment with Field Fabrication

8

in 1982, such as paystubs, tax records, social security records, and/or local union records verifying contributions on his behalf;

- An explanation of why Field Fabrication claimed to have overlooked past pension benefits on his behalf for July 1982 when in his 1993 appeal, Field acknowledged that he had first worked in covered employment in August 4, 1982.

See PRSMF ¶ 33 [Doc. No. 46].

On or about September 20, 2019, the Fund received a letter from Field in which he copied verbatim much of the content of his July 15, 2019 letter, and in response to the Fund's September 16, 2019 letter stated, among other things, that (i) he has never been issued a standard plans examiner license, a standard inspector (mechanical license), or any other license, in the State of Florida, and (ii) he will not be providing any additional proof of employment with regard to his alleged employment with Field Fabrication due to the passage of time, and the fact that the statute of limitations period has passed, but referred the Fund to the documents and correspondence in its file. Id. at ¶ 35.

By letter dated October 31, 2019, Fund staff informed Field that it had reviewed his response but still had questions concerning the use of his Commonwealth of Massachusetts Construction Supervisor License and Home Improvement License to perform work in April 2016, and asked him to provide "details of the permits that have been issued to [him] and describe under what circumstance would [he] be present to obtain a license." Id. at ¶ 36. In addition, Fund staff referenced the other active licenses that he continues to hold, "all of which, if utilized, would be work in Disqualifying Employment," and noted that he has not yet provided information as to "what is required to obtain and maintain all of the above referenced licenses." Id. In that letter, Fund staff requested that Field provide an explanation as to why work subject to

a litigation brought by the Town of Whitman, Massachusetts, against him and Facebook postings showing Field on location at different work sites and venues, suggesting that he may been engaged in Disqualifying Employment, should not be treated as such under the Plan. Id. at ¶¶ 37-38.[6] Fund staff also noted "several discrepancies in the record concerning delinquent contributions remitted on [his] behalf by Field Fabrication," with questions arising "because of contradicting information provided by [Field] during the application process." Id. at ¶ 39.

In a November 14, 2019 letter, Fund staff followed up on conversations with Field on November 12 and 13, 2019, and stated that the Fund agreed with him that (i) the 2008 and 2010 plumbing jobs described in its July 11, 2019 letter were not performed by Field and were instead performed by a company owned by another individual, and (ii) the Florida licenses listed in its September 2019 letter were issued to a David Field with a different birthdate. Id. at ¶ 41. However, Fund staff noted that the remaining information requests listed in the Fund's October 31, 2019 letter remained outstanding, including the information requested regarding his construction/home improvement licenses, his interactions with Quishpilema, and the circumstances in which permits have been or would be issued using his construction/home improvement licenses. Id.

In a December 1, 2019 letter to the Fund, in addition to recopying much of his previous response, Field additionally stated in relevant part: (i) that it was "UNFAIR AND UNREASONABLE" for him to provide records from the time period requested and to "CHECK [] WITH LEGAL ON STATUTE OF LIMITATIONS"; (ii) that "ITS [SIC] VERY DIFFICULT TO REMEMBER 1982 ALMOST 38 YEARS AGO" and that he did not have records from

---

[6] After further correspondence from Field, the Appeals Committee did not rely on these instances in terminating Field's disability benefits. See April 11 Letter, EAR01119-22 [Doc. No. 29-6].

1982, but that "THE RECORDS IN [HIS] PENSION FUND ALLOWED FOR [HIM] TO

RECEIVE [HIS] PENSION 2/1/1995"; and (iii) that he did not have any additional information

related to the two permits issued in February and April 2016 to Quishpilema. Id. at ¶ 42.

On or about December 5, 2019, the Fund received another letter from Field that, in part,

provided the Fund with an undated "affidavit" from Quishpilema stating that he used Field's

construction supervisor and home improvement license to obtain permits in February and April

2016 without Field's authorization and permission. Id. at ¶ 43. The Fund wrote to Quishpilema

on February 19, 2020, requesting information, but did not receive a response. Id. at ¶ 44.

On April 1, 2020, Fund staff forwarded a copy of the January 20, 1995 Field Fabrication

letter that stated that Field was "a journeyman employed at our firm" for periods in 1982, 1990

and 1991, and requested an explanation of how Field could have been an employee of Field

Fabrication with no record of such employment on the SSA Earnings Report. Id. at ¶ 48. Fund

staff asked whether Field received pay from Field Fabrication. Id. In this April 1, 2020 email,

Fund staff also asked for the information previously requested in letters from the Fund in January

and March 2020, "the contact information for Juan Quishpilema," so that the Fund could request

additional information from him. Id. at ¶ 49.

On the same day, Field responded to the Fund staff by letter. Id. at ¶ 50. With respect to

the questions about his employment at Field Fabrication, Field stated that he clearly did work at

Field Fabrication during the relevant years, but reiterated that he cannot explain further why it is

not reflected the records for those years and it is unreasonable to ask him to do so given the

many years that had passed. Id. In the same April 1, 2020 letter, Field stated, in response to the

Fund staff's request for additional contact information for Quishpilema, that he believed

Quishpilema may have relocated to Ecuador, and he did not know how to contact him. Id. at ¶ 51.

E.    *Appeals Committee Decision*

The Appeals Committee met and considered Field's appeal on April 7, 2020, based on the Administrative Record, including a staff memorandum dated April 7, 2020. Id. at ¶ 52. By letter dated April 11, 2020, Fund staff informed Field that the Appeals Committee considered and denied his appeal. Id. at ¶ 53. The denial stated that the Appeals Committee considered each of the following:

- Should Field's disability benefits be terminated because the SAA Earnings Report showed that he exceeded the earnings limit described under Section 16.06(e) of the Plan?

- Should Field's disability benefits be terminated because of his work in Disqualifying Employment?

- Was Field entitled to disability benefits in the first place?

Id. at ¶ 54.

As to the first question, the Appeals Committee subsequently acknowledged that Field's SSA earning records had been corrected to reflect that he had no earnings for tax years 2016 and 2017 and concluded that his disability benefits should not be terminated because of earnings exceeding the limit under the Plan. Id. at ¶ 56.

With respect to the second question, the Appeals Committee found that Field was not entitled to receive disability pension benefits beginning in February 2016 because he participated in Disqualifying Employment. Id. at ¶ 59. Based on the Trustees' knowledge of licensing in the construction industry and information provided by Field, the Appeals Committee was

unpersuaded that Field's construction supervisor license was used without his knowledge and/or permission in February and April 2016. Id. at ¶ 57. The Appeals Committee found Field's claim that his construction supervisor license was twice used fraudulently and that he had not engaged in any Disqualifying Employment in February and April 2016 unconvincing where despite repeated requests, Field had failed to provide any documentation beyond the undated affidavit from Quishpilema to support the claim. Id. at ¶ 58. The Appeals Committee "determined that [Field] w[as] no longer entitled to receive the Disability Benefit beginning in February 2016 as a result of the Disqualifying Employment and that $33,809, plus interest is due to the Fund for payments made on and after March 1, 2016." April 11, 2020 Letter, EAR01121 [Doc. No. 29-6].

With respect to the third question, the Appeals Committee determined that it was bound to deny Field's appeal because Field had not worked in Covered Employment with his father's company, Field Fabrication, and thus had not accrued sufficient Pension Credit to qualify for this benefit from the Fund once those hours and contributions were discounted. PRSMF ¶ 60 [Doc. No. 46]. The Appeals Committee reasoned as follows:

(i)     At the time of Field's original application for a Disability Pension, he did not have sufficient Pension Credit to satisfy the eligibility requirements.

(ii)    Subsequently, his father's company, Field Fabrication, submitted hours reports on two separate occasions, with nearly the exact number of hours needed to give Field the required 10 years of Pension Credit, and transmitted contributions for those hours by cashier's check rather than company check.

(iii)   The newly reported hours covered the period after the date that Field originally certified was his last day of covered employment.

(iv)    The SSA Earnings Report for Field did not reflect any employment with Field Fabrication for any of the years in question.

(v)     Field could not provide any explanation as to why the SSA report failed to reflect employment with Field Fabrication and could not provide any documentation showing that he actually worked there.

Id. Field was given 45 days to produce any other documentation to support his claim that he worked for Field Fabrication, or evidence that he needed additional time to produce such documentation. Id. at ¶ 61. Field made no further submission. Id.

F.    *Challenge to the Appeals Committee's Decision*

Field was notified of his right to file an action under ERISA Section 502(a) to challenge this decision. Id. at ¶ 62. He requested records relating to his April appeal and the Fund sent him such in a zip file attached to an email from Fund staff dated April 23, 2020. Id.

On July 17, 2020, Fund staff provided Field's counsel with copies of the following materials: (i) Field's claim file; (ii) the Plan Document, Trust Document, and Summary Plan Description; and (iii) other information related to Field's disability pension claim. Id. at ¶ 63.

On September 30, 2020, Fund staff provided Field's counsel with copies of the Plan and Trust Documents that were in effect in 1991, including the applicable Local 17 collective bargaining agreement. Id. at ¶ 64.

## II.    Standard of Review

When a denial of benefits is challenged under ERISA, 29 U.S.C. § 1132(a)(1)(B), the standard of review depends largely upon whether "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Leahy v. Raytheon Co., 315 F.3d 11, 15 (1st Cir. 2002) (quoting Firestone Tire &

Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). "[W]here the plan grants the plan administrator or another fiduciary the discretionary authority to construe the terms of the plan or to determine a participant's eligibility for benefits, . . . [courts] apply a deferential standard of review, upholding the administrator's decision unless it is arbitrary, capricious, or an abuse of discretion." Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 20 (1st Cir. 2014) (internal quotations omitted). "In such cases, summary judgment is simply a vehicle for deciding the issue and the non-moving party is not entitled to the usual inferences in its favor." D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011) (internal quotations omitted).

Said differently, when applying the arbitrary and capricious standard, the district court's role is "to 'sit[ ] more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary.'" Al-Abbas v. Metropolitan Life Ins. Co., 52 F. Supp. 3d 288, 294 (D. Mass. 2014) (quoting Leahy, 315 F.3d at 17-18).

The First Circuit has also "emphasized that our review of whether a plan administrator abused its discretion does not require that we determine either the 'best reading' of the ERISA plan or how we would read the plan de novo." D & H Therapy Assocs., LLC, 640 F.3d at 35.

### III.    Discussion

A.    *Fund's Decision on Eligibility*

1.    The Plan Properly Reviewed its Own Prior Determination

Field contends that the Fund's overturning of its prior decision finding him eligible was improper where the plain language of the Plan says that decisions of the Trustees or any delegate of the Trustees shall be "final and binding."

The Fund contends that the Plan's "final and binding" language marks the end of the internal appeal process at the Fund and thereby triggers a Plan participant's right to appeal an adverse decision in court. The Fund contends that such language does not restrict the authority and duty of the Trustees to apply the Plan Document according to its terms and to correct prior benefit determinations later found to be contrary to the terms of the Plan Document. The Fund further contends that the Trustees have both the authority and duty to correct any prior benefits determinations later found to have been in error.

Section 8.02 of the Plan Document clearly states, "[i]f a Participant or Pensioner or other claimant to benefits makes a materially inaccurate statement related to his claim for benefits, or furnishes materially inaccurate or incomplete information or proof relative to eligibility or continued eligibility for benefits, then benefits may be denied, suspended, or discontinued . . ." PRSMF ¶ 55 [Doc. No. 46]. Moreover, the Fund's Summary Plan Description reiterates that "[d]isability Benefits are subject to modification or termination at any time." 2014 Summary Plan Description 63 [Doc. No. 43-3].

In sum, the court finds that the Fund did not abuse its discretion when interpreting the term "final and binding" not to preclude the Fund from reassessing a Plan participant's eligibility pursuant to the Plan Document.

2.       Standard of Eligibility

Having determined that the Appeals Committee's consideration of the eligibility issue was not an abuse of discretion, the court turns to Field's contention that the Plan does not require a beneficiary to prove or re-prove his initial eligibility or employment via social security earnings records or tax documents. Rather, according to Field, to qualify for a disability pension under the Plan, the worker need only to have contributions made on his behalf by one or more

Contributing Employers for ten years of Pension Credit, including five years of Future Service Credit.

The Fund contends that it applied the Plan's standard of eligibility consistently and gave Field many opportunities to provide the documentation necessary to prove his eligibility. It argues further that the Plan Document does not itemize what specific types of information may or may not be requested in these circumstances. The Plan Document directs each Participant, Pensioner or Beneficiary to "furnish the Fund Office with <u>any information or proof requested by it and reasonably required to administer the Plan,</u> and makes clear that, if a Participant, Pensioner or other claimant for benefits 'furnishes materially inaccurate or incomplete information or proof relative to eligibility or continued eligibility for benefits, <u>then benefits may be denied, suspended, or discontinued to the extent permitted by law.</u>'" PRSMF ¶ 55 [Doc. No. 46] (emphasis added). According to the Fund, it determined that Field was not employed by Field Fabrication for the hours at issue, and therefore never eligible for the Disability Pension, based on the Administrative Record.

"[A]n ERISA benefit determination is within the discretion of the plan administrator so long as it is 'reasoned and supported by substantial evidence.'" <u>D & H Therapy Assocs., LLC,</u> 640 F.3d at 35 (quoting <u>Wright v. R.R. Donnelley & Sons Grp. Benefits Plan</u>, 402 F.3d 67, 74 (1st Cir. 2005)). It is undisputed that, to be eligible for full disability benefits, the individual must "have at least 10 years of [P]ension [C]redit," reflecting at least 10 years of Covered Employment. DRSMF ¶ 5 [Doc. No. 34]. No provision in the plan limits how the Fund is to verify eligibility. Indeed, the Plan provides that "the Trustees [shall have] the sole and absolute power, authority and discretion to determine: (1) the standard of proof required in any case . . . (5) the crediting of Future or Past Service Credit and/or Contribution Hours; and (6) the crediting

of Hours of Work and Years of Service." PRSMF ¶ 4 [Doc. No. 46].[7] The court finds that the Fund's determination that it needed additional information for Pension Credit and Covered Employment verification does not read a new requirement into the Plan.

Neither was the Fund's request for additional information regarding Field's employment at Field Fabrication during the early 1990's unreasonable as Field contends. Upon review of Field's file, the Fund identified substantial discrepancies between the additional hours Field Fabrications reported that Field had worked and Field's own statements to the Fund in his 1993 appeal, as well as his earnings as reported to the SSA. September 16, 2019 Letter, EAR00559-61 [Doc. No. 29-3]. In addition to requesting that Field provide "any proof to verify" that he worked at Field Fabrication in the years Field Fabrication reported he did, such as paystubs, tax records, social security records, and/or local union records, the Fund asked Field to "explain" the discrepancies. Id. Field did neither.[8] The court finds no abuse of discretion in the Fund's request for verification of Field's purported Covered Employment at Field Fabrication or an explanation for the discrepancies in Field's file.

---

[7] Field's reliance on D & H Therapy Assocs., LLC is misplaced where, in that case, the First Circuit found the plan administrator abused its discretion in determining that the plaintiff had never been eligible for benefits based on an inconsistent definition of the term "earnings" as applied to pre- and post-disability. See 640 F.3d at 38-41. In this case, the Fund has not altered its definition of Pension Credit, but reassessed whether there was sufficient evidence that Field had sufficient Pension Credit.

[8] That Field responded consistently that he worked for Field Fabrication does not make these answers responsive to the questions the Fund posed to him. While Field may not recall specifics related to his employment at Field Fabrication nearly three decades ago, Field proffered no explanation for the discrepancies. Furthermore, the reasons for the discrepancies provided by Field in his motion papers, such as perhaps he was paid in cash by his father's company and his father did not report the payments to the Internal Revenue Service or the SSA, are of no moment where those reasons were not provided to the Appeals Committee.

As the discrepancies remained unexplained and no additional proof of employment was provided, the Appeals Committee also acted well within its discretion when it determined that Field was not working in Covered Employment with Field Fabrication during those times and therefore had not accrued sufficient credit to vest in a benefit from the Fund. April 11, 2020 Letter, EAR011119 [Doc. No. 29-6].

Accordingly, the Fund's denial of Field's appeal of the 2016 termination of his Disability Benefits based on the determination that he did not have sufficient hours of Covered Employment to become eligible for such benefits was consistent with the Plan terms and not arbitrary or capricious.[9]

B.    *Fund's Decision on Disqualifying Employment*

Having concluded that the Fund properly denied Field's appeal on the ground that he was ineligible for disability benefits, the court need not address Field's argument regarding disqualification of employment. In any event, Field fares no better with this argument.

Field contends that the Fund's refusal to "meaningfully engage" with the evidence that he submitted to show that he did not engage in disqualifying employment was arbitrary and

---

[9] Field's argument that the Appeals Committee could not rely on insufficient Pension Credit since the Fund staff's July 11, 2019 letter terminated his disability benefits for different reasons is without merit. "Under the Department of Labor's regulations, a plan must provide 'written or electronic notification of any adverse benefit determination.' 29 C.F.R. § 2560.503–1(g)(1). This notification must state '[t]he specific reason or reasons for the adverse determination,' id. § 2560.503–1(g)(1)(i); it must make reference 'to the specific plan provisions on which the determination is based,' id. § 2560.503–1(g)(1)(ii); and it must include information about how the claimant can pursue further review and rectify the deficiencies in his application, see id. § 2560.503–1(g)(1)(iii), (iv)." Bard v. Bos. Shipping Ass'n, 471 F.3d 229, 239 (1st Cir. 2006). The July 11, 2019 letter satisfied those requirements, as did the Appeals Committee's final determination letter. Nothing in these requirements preclude the Appeals Committee, to which the Trustees had delegated the power and authority discussed above, from conducting a comprehensive review of Field's file. Nor can Field show any prejudice where the Appeals Committee gave him numerous opportunities to respond to questions as they arose.

capricious. The Fund contends that the Appeals Committee considered the evidence Field put

forth in support of his position that his licenses were twice used fraudulently and that he did not

perform Disqualifying Employment in 2016 but found the evidence unpersuasive.

A plan administrator's denial of benefits is not arbitrary, capricious or abuse of discretion

if it is "reasoned and supported by substantial evidence." Alexandre v. Nat'l Union Fire Ins. Co.

of Pittsburgh, PA, 22 F.4th 261, 272 (1st Cir. 2022) (quoting Stamp v. Metro. Life Ins. Co., 531

F.3d 84, 87 (1st Cir. 2008)). "Evidence is substantial if it is reasonably sufficient to support a

conclusion, and the existence of contrary evidence does not, in itself, make the administrator's

decision arbitrary." Id. (quoting Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir.

2004)). "Thus, the question before us is not which side is right, but whether the compensation

committee's decision to deny [plaintiff's] claim for severance benefits was reasonable on the

record before it." Niebauer v. Crane & Co., 783 F.3d 914, 928 (1st Cir. 2015).[10]

To answer that question, a short summary of the record is warranted. The Fund sent a

letter to Field notifying him that it had identified that Field participated in Disqualifying

Employment including on or around February 2016, and April 2016. July 11, 2019 Letter,

EAR00594 [Doc. No. 29-3].[11] The Administrative Record includes two projects constituting

Disqualifying Employment performed pursuant to Field's active Home Improvement License,

---

[10] Relying on Kamerer v. Unum Life Ins. Co. of Am., 334 F. Supp. 3d 411, 427 (D. Mass. 2018),
Field argues that the Fund bears the burden to prove why Field is not entitled to benefits. Field's
analogy to Kamerer fails where in that case the question was whether a limitation under the plan
applies, whereas here the question is whether Field was disqualified from receiving benefits.

[11] The letter also identified work performed on August 2008 and May 2010, July 11, 2019 Letter,
EAR00594 [Doc. No. 29-3], but, as mentioned above, this inquiry was resolved after Field
provided information that another individual performed the 2008 and 2010 work and guidance
on how the Fund could confirm with the Town of Arlington, Massachusetts, where the work was
performed, July 15, 2019 Letter, EAR00559 [Doc. No. 29-3].

Master Sheet Metal License, and/or Construction Supervisor License in 2016. In his response to the Fund's letter, Field stated that he was in Florida from January 30, 2016, until April 30, 2016, recovering from a surgery. July 15, 2019 Letter, EAR00559 [Doc. No. 29-3]. Field informed the Fund that: (i) his license was used by Quishpilema for both 2016 projects, (ii) Field received no income and or benefit from those projects, and (iii) Field had instructed the City of Boston to not issue any permits under his license without his presence and instructed Quishpilema to not use his license again. Id.

Thereafter, the Fund asked Field to "provide details of the permits that have been issued to [him] and describe under what circumstances would [he] be present to obtain a license." September 16, 2019 Letter, EAR00560 [Doc. No. 29-3]. The Fund requested the information again in two more letters. October 31 and November 14, 2019 Letters, EAR00335-39 [Doc. No. 29-3]. Field finally responded that he did "not have any further information regarding the [] two [2016] permits." December 1, 2019 Letter, EAR00190 [Doc. No. 29-1]. A few days later, Field provided to the Fund an undated document titled "Affidavit," purportedly signed by Quishpilema and claiming that Quishpilema performed the February and April 2016 work using Field's license without Field's authorization and permission. December 5, 2019 Letter, EAR00098 [Doc. No. 29].

On February 19, 2020, the Fund sent a letter to Quishpilema requesting a meeting to ask questions regarding the purported Affidavit. EAR00013-14 [Doc. No. 29]. Quishpilema did not respond to the letter. On April 1, 2020, the Fund emailed Field requesting updated contact information for Quishpilema. EAR01035 [Doc. No. 29-6]. In response, Field stated that Quishpilema "may have relocated to Ecuador" and Field does not know how to reach him. April 1, 2020 Letter, EAR01044 [Doc. No. 29-6].

In its letter denying Field's appeal, the Appeals Committee stated that it had "reviewed the information that [Field] provided concerning the use of [his] Construction Supervisor's licenses in February and April 2016 and the information concerning possible other work in Disqualifying Employment. The Committee was unpersuaded that [his] Construction Supervisor's licenses was used without [his] knowledge based on their knowledge of licensing in the construction industry and based on the information that [he] provided." April 11, 2020 Letter, EAR01121 [Doc. No. 29-6]. The Committee continued, "[d]espite repeated requests . . . [Field] ha[s] failed to provide any additional documentation beyond the single statement from Juan Quishpilema," creating "an adverse inference suggesting that [he] [him]self used [his] Construction Supervisor license or, at the least, that it was used with [his] knowledge and consent, either of which provides a sufficient basis to terminate [his] Disability Benefit." Id. at 01120-21. Therefore, the Committee "determined that [Field] w[as] no longer entitled to receive the Disability Benefit beginning in February 2016 as a result of the Disqualifying Employment and that $33,809, plus interest is due to the Fund for payments made on and after March 1, 2016." Id. at 01121.

Field contends that the Fund simply rejected the signed statements by Quishpilema claiming that he used Field's licenses to complete the 2016 work. As the Fund documented, however, it made repeated attempts to reach Quishpilema to verify his statements and was unable to do so. It was not an abuse of discretion for the Fund to discount the document where the Fund was not able to ask Quishpilema any questions regarding the authenticity of the document or the statements contained therein. Moreover, Field himself did not respond to the Fund's questions regarding what circumstances resulted in Quishpilema purportedly using his licenses.

"It is the responsibility of the Administrator to weigh conflicting evidence," Vlass v. Raytheon Emps. Disability Tr., 244 F.3d 27, 32 (1st Cir. 2001), and "in the presence of conflicting evidence, it is entirely appropriate for a reviewing court to uphold the decision of the entity entitled to exercise its discretion," Gannon, 360 F.3d at 216. Accordingly, the court finds that the Fund's determination that Field engaged in Disqualifying Employment in 2016 was not arbitrary or capricious where Field's licenses were used to complete the work, Field offered no evidence to support his claim that he was in Florida during that time period, and the Fund was not able to reach the individual Field claims used his licenses without authorization.

C.     *Conflict of Interest*

Field contends that the court's deference to the Fund's decision should be heavily tempered by its conflict of interest, as the benefits are paid out of its own funds. The Fund contends that Field fails to allege any facts to support a finding that the Appeals Committee's decision was influenced by a conflict of interest such that the court should refrain from applying the abuse of discretion standard of review.

The Court in Metro. Life Ins. Co. v. Glenn, held that where "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket . . . . this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." 554 U.S. 105, 108 (2008). Glenn's analysis occurred in a situation where the sole administrator of the employee benefit plan, determining whether an employee's claims for benefits were valid, and the insurer, paying valid benefits, were one and the same. Id. Thus, "'every dollar provided in benefits [was] a dollar

23

spent by . . . the employer; and every dollar saved . . . [was] a dollar in [the employer's] pocket.'"
Id. at 112 (quoting Bruch v. Firestone Tire & Rubber Co., 828 F.2d 134, 144 (3d Cir.1987)).

A circuit split exists as to whether Glenn's conflict of interest analysis applies equally to
multiemployer benefit plans. Compare Rabinak v. United Bhd. Of Carpenters Pension Fund, 832
F.3d 750, 755 (7th Cir. 2016) ("Unlike the employer in Glenn who both solely funded the
benefits and determined eligibility, the plan [] is a multi-employer nonprofit welfare plan") and
Anderson v. Suburban Teamsters of N. Illinois Pension Fund Bd. of Trustees, 588 F.3d 641, 648
(9th Cir. 2009) (holding no conflict of interest exists where the plan is "a multi-employer benefit
trust fund," funded by the participating employers not the Trustees, and "the Board of Trustees
consists of both employer and employee representatives, who determine employee eligibility
under the Plan. Both sides are at the table.") with Durakovic v. Bldg. Serv. 32 BJ Pension Fund,
609 F.3d 133, 138 (2d Cir. 2010) (rejecting the argument that no conflict exists "within the
meaning of Glenn because the [f]unds are trusts administered by bodies composed equally of
employee and employer representatives").[12]

The First Circuit has held that "a conflict exists whenever a plan administrator, whether
an employer or an insurer, is in the position of both adjudicating claims and paying awarded
benefits." Lavery v. Restoration Hardware Long Term Disability Benefits Plan, 937 F.3d 71, 79
(1st Cir. 2019) (quoting Denmark v. Liberty Life Assur. Co. of Bos., 566 F.3d 1, 7 (1st Cir.
2009)). This court has not identified, however, any First Circuit decision addressing whether the

_____

[12] In Durakovic, the Second Circuit interpreted Glenn's analysis as proceeding in a two-step
inquiry: (i) "whether the 'plan administrator both evaluates claims for benefits and pays benefits
claims,'" and (ii) "[i]f so, . . . how heavily to weight the conflict of interest thus identified,
considering such circumstances as whether procedural safeguards are in place that abate the risk,
'perhaps to the vanishing point.'" Durakovic, 609 F.3d at 138 (quoting Glenn, 554 U.S. at 112,
118).

same rule applies when the plan administrator is not an employer or an insurer but the Trustees of a multiemployer plan. In this court's view, the conflict of interest identified by the Supreme Court in <u>Glenn</u> is greatly diminished where the Plan is a multiemployer pension plan and the Appeals Committee that made the final decision as to Field's pension benefits is comprised of one labor Trustee and one management Trustee.

Regardless, even if a different standard does not apply for a multiemployer pension plan administered by an equal number of labor and management trustees, the First Circuit has read <u>Glenn</u> to have "clarified that the presence of a conflict of interest does not alter the standard of review, but rather is 'but one factor among many that a reviewing judge must take into account.'" <u>Ortega-Candelaria</u>, 755 F.3d at 27 (quoting <u>Glenn</u>, 554 U.S. at 116). Since the "Court explicitly declined to specify a burden-of-proof rule for determining the weight that a conflict should be given," the First Circuit "appl[ies] the same burden of proof to the conflict issue that [it] do[es] to any other aspect of an ERISA claim for improper denial of benefits; hence, [the plaintiff] bears the burden of showing that the conflict influenced [the plan administrator's] decision." <u>Cusson v. Liberty Life Assur. Co. of Bos.</u>, 592 F.3d 215, 225 (1st Cir. 2010), <u>abrogated on other grounds by Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan</u>, 577 U.S. 136 (2016).

In this case, Field has not stated how the asserted conflict influenced the Fund's decision to terminate his benefits. The court does not find compelling Field's argument that the Fund's multiple investigations into his eligibility is evidence of improper motive or adversarial behavior where the Fund has an obligation under the Plan to "verify on a regular basis" the eligibility of Fund participants. In any event, the Administrative Record provided to the Appeals Committee was redacted as to any identifying information thereby nullifying any personal bias that those

conducting the investigation may have had against him. See generally, EAR00001-EAR01117 [Doc. No. 29]. Field also received numerous opportunities to provide the information requested, including the Appeals Committee's April 11, 2022 letter giving Field yet another 45 days to produce documentation to support his claim that he in fact did work for Field Fabrication or evidence that he needed additional time to produce the requested documentation. April 11, 2020 Letter, EAR02212 [Doc. No. 29-6]. On this record, Field's vague claim of bias is without any support.

Nor is Field's argument that he is being treated unfairly particularly persuasive where the Fund is not seeking recoupment of payments made to Field from February 1, 1995, through February 28, 2016, but only to stop further unwarranted payment after realizing, in connection with reviewing the work disqualification issue, that Field did not have sufficient Pension Credit in the first instance. To the contrary, it is the Fund that would be impeded from fulfilling its ongoing fiduciary obligation to Plan participants if it could not correct errors regarding eligibility determination once identified.

As the discussion above has shown, even taking into consideration the inherent conflict of interest present, the court finds that the Fund's reasoning for the denial of benefits is sufficient to survive an abuse-of-discretion standard.

## IV.   Conclusion

For the foregoing reasons, Field's Motion for Summary Judgment [Doc. No. 30] is DENIED and the Fund's Renewed Motion for Summary Judgment [Doc. No. 41] is GRANTED.


IT IS SO ORDERED.

September 30, 2022                                         /s/ Indira Talwani
                                                          United States District Judge